HARVEY BREMER, *Respondent*, v. H. R. SHOULTES *et al.*, *Appellants.*[1]

*Hull & Murray* and *Ponder & Ponder,* for appellants.

*C. D. Cunningham* and *W. Grant Armstrong,* for respondent.

MILLARD, J.—This action was brought to recover for personal injuries sustained by plaintiff while assisting in sawing wood with a buzz saw on the premises of defendants. Trial of the cause to a jury resulted in a ver-

[1]Reported in 110 P. (2d) 641.

dict in favor of the plaintiff. From the judgment entered, motions for judgment notwithstanding the verdict and for new trial having been denied, the defendants appealed.

The only negligence claimed by respondent is that appellants' vice-principal failed to provide for respondent, at the time the wood cutting operation commenced, a safe place in which to work and did not keep the place reasonably safe during the wood cutting operation, which includes the question whether the instrumentality supplied by appellants was reasonably safe and adequate for the purpose for which it was furnished. There is no contention by respondent "that there was any negligence in the actual operation of the saw."

In addition to challenging the verdict on the ground that respondent was not their employee, appellants contend: (1) That they were not guilty of any negligence in the wood sawing operation out of which this action arose; (2) that the doctrine of *res ipsa loquitur* is not applicable to the facts in the case at bar; and (3) that the negligence, if any, proximately contributing to the injury of respondent was that of fellow workmen, hence respondent may not recover for the injuries thereby sustained.

Mindful of the rule that all competent evidence in the record which is favorable to the respondent, we must regard as true and must give to the respondent the benefit of every favorable inference which may reasonably be drawn from such evidence, we summarize, as follows, the evidence adduced on behalf of respondent:

Jim Lewis and Orville Peterson, who had not reached their majority at the time of the accident, were employed as farm hands on the farm of appellants in Lewis county. The wife of appellant marital com-

munity was in charge of the farm when her husband was absent therefrom. Appellants own two farms. They resided upon the one, and the other farm was designated the "upper place." Fred Nolan was a charity tenant in the house on the upper place; that is, he was unable to pay rent, and appellants permitted him to remain on the place without any requirement for rental.

Appellants owned a wood sawing device, which weighed approximately five hundred pounds. This machine consisted of a metal mandrel, upon one end of which was fastened a circular saw thirty inches in diameter, and on the other end was a pulley. The mandrel, saw, and pulley were set upon a wooden frame consisting of runners and uprights to support it, and alongside and attached thereto by means of a metal pipe was a tilting table, which could be tilted or moved forward as the wood resting thereon was pushed against the saw. The tilting table did not extend beyond the saw blade. A belt running from a tractor was the power which operated the saw.

This saw, which had not been used since the previous fall, at which time it was in fairly good condition and had remained outside near the house since that time, had not been inspected by appellants prior to its use in the spring of 1939, except a casual inspection incidental to moving the saw when some brush was burned near the house. The saw frame, tilting table, and mandrel were near a wood pile at the upper place. The tractor and saw were taken to that point at the time the wood sawing commenced in April, 1939.

About one month prior to April 19, 1939, Fred Nolan suggested to Shoultes that, when the latter was sawing wood, he would like to help. On Saturday, April 15, 1939, Shoultes departed for Spokane to be absent three or four days. Prior to his departure, Shoultes in-

structed Lewis and Peterson, two of his farm hands, to go to the upper place and saw the cord wood on that farm after the two farm hands had performed some work at the home place. Lewis, who was then twenty years old, had worked for appellants about two and one-half years. Peterson, then twenty years old, had worked on appellants' farm six months.

Tuesday, April 18, 1939, Lewis and Peterson, in the presence of a child of Fred Nolan, discussed the subject of sawing wood at the upper place the following day. The Nolan child reported to his father, Fred Nolan, what he had heard, and the evening of April 18, 1939, Nolan visited his brother-in-law, respondent, who resided about two miles distant from appellants' upper place, and requested him to assist in sawing appellants' wood as a substitute for Nolan. At this time, respondent and Shoultes were not acquainted, and neither had ever spoken to the other. Respondent was forty years of age, had worked in the woods for about twenty-five years, and was experienced in sawing wood with buzz saws.

On the morning of April 19th, Lewis and Peterson went to the upper place with the tractor, saw blade, and equipment for making repairs to the sawing device, if repairs were necessary. When they arrived at the upper place, they were met by respondent, who stated that he was to work in Nolan's place. This substitution of respondent for Nolan was arranged between respondent and his brother-in-law, Nolan, without the knowledge of Shoultes and during Shoultes' absence.

After repairing the saw frame, the circular saw blade was attached, the belt was placed on the pulley, there was an alignment of the tractor, and the saw frame was staked to the ground. Respondent participated in these preparations to the extent, at least, of helping to prepare some of the stakes. Lewis was the sawyer, Peter-

son carried the wood from the wood pile to the saw, and respondent was off-bearer. The wood was cut from cord wood lengths into sixteen-inch lengths. This sawing operation proceeded, and in the afternoon Peterson became ill; however, the operation was continued by Lewis and respondent until Nolan, who was returning from work, assisted for a short time. During the first day, April 19th, the saw frame was moved two or three times and, of course, staked down each time after moving. This moving was to place the sawing device closer to the wood pile.

Upon his return to the home farm that evening, Lewis informed Mrs. Shoultes that Peterson was ill. She discussed with Lewis the matter of obtaining some one in lieu of Peterson. She suggested the name of Charles Graves, who had previously worked for appellants, and directed Lewis to employ him. Mrs. Shoultes was at that time informed that respondent was working with Lewis, but that there should be three men in the wood sawing operation. Lewis informed Graves that evening of his employment and arranged for him to assist the following day.

The next morning, April 20th, Lewis proceeded to the upper place and on the way met Charles Graves, who accompanied him to the upper place, where they found respondent ready for work. The operation of sawing the wood proceeded as the day before. The saw was moved twice during the day and each time was restaked and the tractor placed in line, all three men taking part in the work of moving the device and arranging for the renewal of the operation of sawing. The last time, the equipment was moved five hundred feet. Respondent admitted that he drove one stake to keep belt from rubbing the tire, and each time the equipment was moved respondent watched the staking and was satisfied with the conditions he there observed.

About four o'clock the afternoon of April 20, 1939, while sawing a piece of wood which was either timber-bound or split, the saw pinched, or jammed, and threw the stick down. According to the testimony of respondent, the saw frame "came right up in the air . . . the whole runner or something and she came up and came towards me. She 'rared' up over the stick, . . . " and the saw, frame and all came toward respondent. The sharp teeth of the saw permanently injured respondent's right arm. Whether the stakes were loosened or the frame broke, respondent could not say. The evidence is to the effect that the saw frame and all of the saw equipment rose about two feet and remained there.

If we concede, *arguendo*, that respondent was an employee of appellants, there is a lack of evidence that the place selected for sawing the wood was unsafe, the record is bare of evidence as to the kind of a guard or barrier the appellants should have provided, there is an absence of evidence that a guard or barrier would have prevented the injury to respondent or that such a guard was practicable, and there is no showing that the materials in the saw frame were too light to hold the saw or that the power in operating the saw was excessive for the safe operation of the machinery.

The equipment, its location and operation, were open and obvious to respondent, who had worked with the equipment for two days. The record is devoid of evidence from which it may be reasonably inferred that a lack of knowledge on the part of respondent or failure to warn on the part of appellants was the proximate cause of respondent's injuries. No information could have been given to respondent that he did not already possess. Respondent, for twenty-five years, worked in the woods. He was experienced in falling

timber and in logging operations. He had worked with other buzz saws in cutting wood. He was satisfied with the equipment, and each time he was content with the location of that equipment and with its staking. He said respecting the equipment, its location and its staking, "it looked all right to me."

At the time of the accident, the saw and saw frame equipment were located on a slope, and the upper runner was set into a trench three or four inches in depth. There were four or five wooden stakes, each about eighteen inches long, driven into the ground at the corners of the frame to hold it in position, and one stake was placed at the end of the tilting table. These stakes consisted of two or three steel pins from eighteen inches to three feet long and a couple of fir stakes from two and one-half to three feet long. Respondent testified that he sharpened two wooden stakes that were used, and that other stakes were used, and that the staking seemed all right to him. These stakes were driven into the ground so that approximately a foot remained above ground.

The most favorable view of the evidence for respondent is that, while he and his two fellow workmen were sawing a split stick or timber-bound stick, the saw pinched, jerked the wood down, the saw came up over it, and the whole frame rose up and remained up on the stakes or sawdust. Conclusively, therefore, no negligence on the part of the appellants has been shown. The proximate cause was the tilting or raising up of the saw frame, which was due only to the failure of the stakes or the failure to properly stake.

That is, the negligence, if any, which was the proximate cause of the accident was the negligence of respondent and his fellow workmen who were in charge of the equipment and who had moved it and restaked it three or four times, and not negligence on

the part of appellants; hence, the doctrine of *res ipsa loquitur* is inapplicable..

"The maxim of *res ipsa loquitur* is applied in negligence cases on the theory that the accident, in the light of surrounding circumstances, is of such a character as to raise a presumption of negligence from the occurrence itself; and on the further theory, that the injured party is not in a position to explain its cause; while the party charged, having more favorable opportunities, is in a position to thus explain and show himself free from negligence, if such be the case." *Lynch v. Ninemire Packing Co.*, 63 Wash. 423, 115 Pac. 838.

See also *Johnson v. Columbia & P. S. R. Co.*, 74 Wash. 417, 133 Pac. 604.

We can not agree with counsel for respondent that Lewis was vice-principal of appellants. The mere fact that this farm hand, about twenty years old, was a regular employee and was experienced in sawing wood with a buzz saw operated by a tractor, is not sufficient to give that farm hand the status of a vice-principal. The role of Lewis was not that of foreman; and, even if so considered, he, respondent, and Graves, at the time they were sawing wood and respondent was injured, were workmen employed in a common service. The only explanation of the accident is that it occurred because of an omission of fellow service and not from lack of superintendence.

We have never held that, by reason of the fact that two or more persons are engaged in a like undertaking, the duty of superintendence follows as a legal obligation. See *Jones v. Baker,* 179 Wash. 25, 35 P. (2d) 1103; *Swanson v. Gordon,* 64 Wash. 27, 116 Pac. 470; *Jock v. Columbia & P. S. R. Co.,* 53 Wash. 437, 102 Pac. 405. The following language in the opinion in *Swanson v. Gordon,* 64 Wash. 27, 116 Pac. 470, may be aptly employed in the case at bar:

"It has never been held that, because two or more men are engaged in a like undertaking, the duty of superintendence follows as a legal obligation. To put the mere details of a work under the burden of independent superintendence would necessitate the employment of one man to oversee every other, no matter what the character of the work. It is generally held that the question of the right of superintendence is to be resolved by reference to the facts of the given case.

. . .

"The workmen were employed in a common service. The accident occurred because of an omission of fellow service, and not from lack of superintendence. Without reviewing the cases relied on, it will be seen by reference that each of them turned on the fact that the character of the work was such that general oversight by an independent agency could not be dispensed with without depriving the injured servant of a substantial right."

The judgment is reversed, and the cause remanded with instructions to dismiss the action.

ROBINSON, C. J., BEALS, SIMPSON, and JEFFERS, JJ., concur.